ROBERT Y. SMITH and ARTHUR J. MANN, co-partners, doing business under the style and firm name of SMITH-MANN GRAIN COMPANY, Appellants, v. C. H. BAILEY, Respondent.

Kansas City Court of Appeals, January 26, 1919.

1. **BOARD OF TRADE: Sales: Intention of Parties: Contracts.** In contracts for sales of commodities in the future there must be an actual intention to deliver or receive the commodity and not an intention simply to settle the differences according to the fluctuation in the market prices of such commodities, and although the transaction may have been carried on under the guise of legitimate trade, it may, nevertheless be shown to have been a gambling contract.

2. ———: **Gambling Contracts: Intent of Parties: Statutes.** Under sections 4780 and 4781, Revised Statutes 1909, the intent of either one of the parties to the buying and selling of commodities for future delivery to gamble on such transactions or to speculate on the rise or fall of the market, is sufficient to and does render the contracts therefor absolutely void, even so as to defeat the commission of the broker, who was ignorant of the gambling intention of his principal, notwithstanding the other party may be entirely innocent and unaware of the first party's intention to gamble.

3. ———: **Instructions: Withdrawing Evidence from Jury.** It was error to refuse an instruction withdrawing from the consideration of the jury evidence on an issue not pleaded in the answer. When it is intended to rest a defense upon any fact not included in the allegations necessary to the support of plaintiff's case, it must be set out specifically.

Appeal from Jackson Circuit Court.—*Hon. Edw. E. Porterfield,* Judge.

REVERSED AND REMANDED.

*W. H. H. Piatt* and *Thomas R. Marks* for appellants.

*H. H. McCluer* and *Omar E. Robinson* for respondent.

BLAND, J.—This suit is one to recover the balance of commissions and money paid out by plaintiffs, who were co-partners, as agents and brokers for the defendant in purchasing and selling grain on the Kansas City Board of Trade, defendant having paid plaintiffs one hundred dollars on the account. There was a verdict and judgment for the defendant and plaintiffs have appealed. The defendant set up in his answer that the contracts out of which plaintiffs' demands grew were wagering or gambling transactions made unlawful by section 4780, Revised Statutes 1909.

Plaintiffs were brokers buying and selling grain for commission on the Kansas City Board of Trade. Defendant, a farmer and stock trader residing in Bates County, Missouri, was one of their customers. Defendant had been dealing through plaintiffs for two or three months prior to plaintiffs' failure in business, which occurred on the 30th day of July, 1914. Defendant was dealing in wheat and corn for future delivery. The first purchase involved in this suit was on July 2, 1914. On that day plaintiffs bought for defendant's account five thousand bushels of September wheat, and on the same day sold for defendant ten thousand bushels of September wheat. Plaintiffs continued to buy and sell wheat and corn for defendant in the month of July, 1914, until and including the 30th of that month, so that during that month defendant had bought and sold forty-five thousand bushels of wheat and five thousand bushels of corn for future delivery.

Defendant testified that at the time he bought and sold the grain mentioned he did not intend to receive any part of it or to deliver any part and had not received or offered to receive, or delivered or offered to deliver, any part of it at any time; that it was his intention to speculate on futures, that is, on the fluctuations of the market, and that he was so speculating but did not tell plaintiffs of this. Prior to the second day of July, 1914, defendant had been speculating in futures through plaintiffs and had a balance in plaintiffs' hands of $863.25. On that day he withdrew $663.25 of this amount and left $200 with plaintiffs for the purpose for himself and another party to thereafter trade in margins. One of the plaintiffs testified that none of the trades made during the month of July was carried to maturity; that all of the same were closed out by buying and selling an equal amount of the commodity traded in, and defendant was charged, or credited as the case might be, on plaintiffs' books with the difference in the price when bought or sold of the grain traded in. When plaintiffs bought grain for defendant's account and the former sold the same amount and kind of grain for defendant's account and the grain had advanced in price, defendant was paid the profits thus made. If the grain went down defendant was charged with the loss. Plaintiffs did not pay for the grain bought for defendant's account nor did they collect for that sold on his account, except as they claimed they did through the grain Clearing Company, an institution hereinafter described.

On July 30th, 1914, defendant was short (meaning that he had sold) ten thousand bushels of September wheat and five thousand bushels of December wheat, and on that day, on account of rumors of a war in Europe, the market was excited and prices fluctuated violently. Defendant testified that he told Mr. Smith, one of the plaintiffs, about 9:30 o'clock on that day, about the time the Exchange opened, that he had seen his father and could get the money from him to margin his September wheat, on which he had sold short, and

that plaintiff, Smith, agreed to advance the money to margin said wheat. Defendant instructed Smith to sell his December wheat. Smith disappeared from the trading pit about eleven o'clock of that day and in the afternoon, after the closing of the Exchange, he told defendant that plaintiffs had failed in business and had closed all of defendant's deals. Defendant complained of plaintiffs having closed his September deals.

When plaintiffs were directed to buy grain they went into the pit on the trading floor of the Kansas City Board of Trade, of which they were members, and bought the same from a fellow broker, likewise a member of the Board of Trade. Each broker had a card called a "pit card;" one side of this card was the "bought" side and the other the "sold" side. The broker buying would make a record of the sale on the bought side of his pit card, showing the quantity, the delivery month, kind of grain, the price, the trading party and the account of his client. He furnished, as required by section 4783, Revised Statute 1909, a written confirmation statement to his clients signed by him showing these facts. The selling broker made a record identical in form on the sold side of his pit card and also gave a written report to the grain Clearing Company of the sale, having thereon a revenue stamp required by the laws and regulations of the State. The grain Clearing Company collected from each of said brokers the money necessary to carry out and perform said contracts on the delivery date and to protect it in its obligation to so carry out and perform the contracts on that day. (That is to say, it collected margins.) The company checked these records against each other and entered upon its bought and sold sheets respectively the full record of each side of the entire transaction reported to them by the brokers, from thence on the contracts were carried by the grain Clearing Company to the last day of the delivery month. None of the wheat was manually delivered on the delivery day but the brokers' demands against each other were off-set and the balance settled in warehouse receipts covering

the grain. One member of the grain Clearing Company stated that it operated practically the same as a bank clearing house and that it was organized for the purpose of facilitating the handling of trades for future deliveries, "by concentrating a good deal of bookkeeping into the hands of one company so that the buyer for the wheat could look to that company for the delivery of it, and the seller of the wheat could make his deliveries to the Clearing Company on all their contracts instead of scattering them around with the different individual traders." Without going into the merits of the matter we will assume for the purpose of this case that this process constitutes an actual delivery of the grain by the grain clearing company.

The actual amount of money carried by the transactions was not placed with the grain Clearing Company but only enough to secure it against a decline in the market. Plaintiffs were not members of the grain Clearing Company, an association carried on by some members of the Board of Trade, so it was necessary for them to clear their trades for future delivery through one Hinsen, who was a member of said company. Plaintiffs, at the close of the day's market, would make through Hinsen written reports of their transactions to the grain Clearing Company, showing the facts as above. The rules of the Board of Trade and the grain Clearing Company prohibited all gambling. Defendant testified that he knew his contracts were being executed on the Board of Trade and he knew that the Board of Trade had rules but "I didn't know much about the rules of the Board of Trade."

It is apparent from the testimony that there were facts from which the jury could say that defendant intended to speculate on the fluctuations of the market and did not intend a bona-fide transaction in buying and selling the grain out of which plaintiffs' demand arose. However, it is insisted upon by the plaintiffs that as defendant knew that his contracts were being executed upon the Kansas City Board of Trade, that he must have known that they were executed in accordance with

the rules and regulations of such Board and the grain Clearing Company, and that as these rules and regulations require actual delivery of the grain, defendant cannot now be heard to say that he was speculating, and for this reason, among others, plaintiffs say their demurrer to defendant's evidence should have been sustained. Assuming that the rules and regulations of the Kansas City Board of Trade and the grain Clearing Company provided for actual delivery and that as defendant knew where his contracts were being executed it must be regarded that he knew of the regulations of these two organizations. [See Bibb v. Allen, 149 U. S. 481.] We think that he could, nevertheless, speculate under such rules but the rules were admissible in evidence as throwing light on the defendant's intention. [James v. Haven & Clement, 185 Fed. 692.]

Section 4780, Revised Statutes 1909, provides:

"All purchases and sales or pretended purchases and sales, or contracts and agreements for the purchase and sale, of the shares of stocks or bonds of any corporation, or petroleum, provisions, cotton, grain or agricultural products whatever, either on margin or otherwise, without any intention of receiving and paying for the property so bought, or of delivering the property so sold, and all the buying or selling or pretended buying or selling of such property on margins or on optional delivery, when the party selling the same, or offering to sell the same, does not intend to have the full amount of the property on hand or under his control to deliver upon such sale, or when the party buying any of such property or offering to buy the same does not intend actually to receive the full amount of the same if purchased, are hereby declared to be gambling and unlawful, and the same are hereby prohibited. Any company, co-partnership or corporation, or member, officer or agent thereof, or any person found guilty of a violation of the provisions of this section, shall be fined in a sum not less than three hundred dollars nor more than three thousand dollars."

Section 4781, Revised Statutes 1909, provides that it shall not be necessary, in order to commit the offense defined in section 4780, that both the buyer and seller shall agree to do the things prohibited in said section 4780.

Under decisions in this State construing sections 4780 and 4781, Revised Statute 1909, the intent of either one of the parties to the buying or selling to gamble in such transaction or to speculate on the rise or fall of the market, is sufficient to and does render the contract absolutely void, notwithstanding the other party may be ever so innocent and wholly unaware of the intention to gamble entertained by the other. [Connon v. Black, 119 Mo. 126; Edwards Brokerage Co. v. Stephenson, 160 Mo. 516; Atwater v. Brokerage Co., 147 Mo. App. 436.] And in order that there be a valid contract for the sale of commodities to be delivered in the future there must be an actual intention to deliver or receive the commodity on the delivery day. An intention to simply settle the difference according to the fluctuations of the market prices of such commodity makes the transaction a gambling one. [Lane v. Grain Co., 105 Mo. App. 1. c. 218, and cases therein cited.]

It cannot be said that because the rules and regulations under which defendant's transactions were being executed provided that the grain Clearing Company make actual delivery of the grain bought and sold, defendant was not gambling, when the evidence shows that he was trading on the fluctations of the market. Defendant testified that he intended to deliver no grain nor to receive any grain. Various trades were made by plaintiffs for him, none of them were carried to delivery date, but plaintiffs bought or sold to protect his trades as the market fluctuated. Defendant, therefore, was using a legitimate process, by which, if he so desired, he could have conducted his trades lawfully, for the purpose of effectuating an unlawful venture, that is, gambling. The fact that others carried out his contracts for him to consummation does not control his intention

in the matter. This was only a guise, as far as he was concerned, to cover up his violation of the law. As was said approvingly by the Supreme Court of the United States in Irwin v. Williar, 110 U. S. 1. c. 511:

"It makes no difference that a bet or wager is made to assume the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade."

When he sold wheat he had no intention whatever of carrying the contract to consummation whether his investment was good or bad, but it was his intention to make money through speculation if the price thereafter went down by buying an equal amount of other wheat at the new price and collecting his "profits" from his brokers. If the price went up then a similar process was gone through with and defendant paid his brokers the amount of his losses. If he bought wheat it was not his intention to carry the contract to consummation so that the wheat might be delivered by him, but to speculate upon the change in the market, and if the market went up it was his intention to sell his contract or to sell an equal amount of other wheat at the new price and pocket the difference as his "profit." If the market went down then a similar process was gone through with and he would pay his brokers the amount of his losses. If this was not speculating on the fluctuations of the market, it would be hard to imagine a case where such speculation would be present.

It is the contention of the plaintiffs that as defendant did not tell plaintiffs that he was gambling or intended to gamble that they are "innocent brokers" and that the transactions were not void and invalid as to them, and that they may recover their commissions and the money advanced. The evidence of Smith, one of the plaintiffs in this case, set forth supra, is almost conclusive of the fact that defendant was gambling and that plaintiffs knew it. This case comes very near being one where we could say as a matter of law that plaintiffs knew this fact. A person may lawfully sell personal property for future delivery which he may not

at the time have on hand if he intends to deliver it and has it on hand for the purpose at the time it is to be delivered on the contract. [Connor v. Black, supra.] We have no doubt but that one may lawfully buy or sell grain for future delivery if at the same time he intends to receive or deliver the same on the delivery day, and after his trade and before delivery he finds that his investment by reason of the change in the market is a poor one, that he may protect himself by buying or selling an equal amount of grain, intending to deliver or receive the same; or that he might under similar circumstances sell the contract wherein he buys or sells grain for future delivery if that contract was a *bona-fide* one, and the intention was for actual delivery at the time it was made. In other words, that one may lawfully trade against his future bona-fide needs. However, the facts in this case show that defendant was not transacting a business of this character. He was buying and selling on the fluctuations of the market and nothing more, and the facts and circumstances surrounding these transactions, including the fact that there were a great many of them, points strongly to the conclusion that plaintiffs knew what defendant was doing.

However, it was not necessary for plaintiffs to have known of defendant's intention to gamble in order that the demand sued for be not recoverable. The contracts, as we have already stated, were void, although it may have been the intention of only one of the parties to the contract to gamble. It is held that such contracts are void in the hands of a person who is a party to them even though he acted in ignorance of the fact that the delivery of the commodity purchased or sold was not intended. [Stewart v. Hutchinson, 120 Mo. App. l. c. 37; Connor v. Black, supra; Edwards v. Stephenson Brokerage Co., supra; Atwater v. Brokerage Co., supra, l. c. 445.] This being the policy of the law, it is apparent that the agent or broker conducting the operations, even though entirely innocent of any knowledge that they were unlawful, is precluded as

well from his right to recover by the unlawful intention of his principal. The contract which he has negotiated through his principal is absolutely void and no enforceable rights may accrue to anyone thereunder, and he is not entitled to recover his commission. [Stewart v. Hutchinson, supra; Connor v. Black, supra; Edwards v. Stephenson Brokerage Co., supra; Atwater v. Brokerage Co., supra, l. c. 445.] This ruling is not based upon any contention that the statute by its terms includes brokers, that is to say, that it provides expressly that a broker may not recover when it is the intention of his principal to gamble, but on the broad ground that the statute makes the contract which the broker negotiated void, and being void, no enforceable rights may accrue thereunder. [See Woolfolk v. Duncan, 80 Mo. App. l. c. 427.]

From what we have said the court properly modified some of plaintiffs' instructions and properly denied others, the ruling upon which plaintiffs complain of here. The court erred in refusing to give plaintiff's instruction No. 11. It sought to withdraw from the jury the fact that defendant claimed that his losses, which were covered by the claim sued upon, were caused by plaintiffs' failure to hold his ten thousand bushels of September wheat as they had contracted to do. As already stated the evidence in connection with this subject shows that about 9:30 A. M. of July 30, 1914, about the time the exchange opened, defendant told Mr. Smith that he had seen his father and could get the money from him to margin his September wheat, on which he had sold short. Smith agreed to advance the money to margin said wheat but he closed defendant's September deals in violation of this agreement. This defense was not pleaded in the answer and to permit the jury to consider it broadened the issue and the instruction should have been given. It is true that a general denial was filed to the petition but this did not raise any such issue. The first count of the petition is on an account stated and alleges that "plaintiffs, at the special instance and request of defendant, acted as his agents

and for him bought and sold for his account, at his order and request, upon said Board grain and paid out for him on account thereof money which he promised to repay to plaintiffs, together with customary commissions for their services in said matters, and received moneys for defendant and from defendant on account of said matters as follows:'' (Here follows a long account and an allegation that defendant had paid $100 on the balance of said account.) The second count is for commissions and money paid out for one Ed Wilson at the special instance and request of defendant.

Plaintiffs made out a prima facie case by showing that they bought and sold grain on the Kansas City Board of Trade at the request of defendant. It would not appear in plaintiffs' evidence that they were instructed by defendant to hold this grain for him and that they agreed to advance money for him in order to do so. This would be "new matter" and in order for defendant to avail himself of it, it should have been specially pleaded. It is stated in Bliss on Code Pleading, Sec. 352:

" 'A general traverse under the Code authorizes the introduction of no evidence on the part of the defendant, except such as tends directly to disprove some fact alleged in the complaint.' 'Whenever a defendant intends to rest his defense upon any fact which is not included in the allegations necessary to the support of the plaintiff's case, he must set it out.' 'The general rule is that any fact which avoids the action and which the plaintiff is not bound to prove in the first instance in support of it, is new matter (and must be specially pleaded); but a fact which merely negatives the averments of the petition is not new matter, and need not be replied to.' The test, then, as to whether the new facts should be specially pleaded is, not whether they tend to show a non-liability, either as affecting the original validity of a contract which may be in suit or as going to its discharge, but whether the statement of the opposite party is true. He does not allege a liability, but facts. These facts will, of course, show a liability, and

the defendant's non-liability is predicated only upon their untruthfulness, or upon new facts which admit their truth, but which shield him from their consequences; and it cannot matter whether these new facts show that he was never liable, or that he has been discharged.''

The same rule is laid down in Northrup v. The Mississippi Valley Ins. Co., 47 Mo. 435; St. Louis Agr'l and Mech'. Ass'n v. Delano, 108 Mo. 217; McDearmott v. Sedgwick, 140 Mo. 172; Bell v. Warehouse Co., 205 Mo. 475; Vieths v. The Planet P. and F. Co., 64 Mo. App. 207; Guinotte v. Ridge, 46 Mo. App. 254; George & Lowe v. Williams, 58 Mo. App. 138; Banking Co. v. Loomis, 140 Mo. App. 62; Gray v. Novinger, 166 Mo. App. 85.

From what we have said the court properly gave defendant's instruction No. 3. What is said about it in plaintiffs' brief as submitting a conclusion to the jury, is not well taken.

It was not error for the court to permit defendant to testify that he did not intend to receive or deliver the grain but that he intended to speculate or gamble on futures. In a case of this kind it is not error to permit a party to state his intention. [Vansickle v. Brown, 68 Mo. 1. c. 634; State v. Banks, 73 Mo. 1. c. 596; 1 Jones on Evidence (1913) sec. 170.]

Plaintiffs' complaint that the written orders that defendant gave his brokers for these transactions show on their face that the transactions were valid ones and that the written orders may not be explained by parol, is not well taken. [Buckingham v. Fitch, 18 Mo. App. 91.]

There are other questions raised but as they will probably not come up on another trial it is not necessary to pass upon them.

The judgment is reversed and the cause remanded. All concur.